**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**

| | | |
|---|---|---|
| **KATHY MOUGHLER and BRIAN** | : | |
| **MOUGHLER, individually and as** | : | |
| **parents and natural guardians of** | : | **Case No.** |
| **L.M., a minor, and TINA JAMESON and** | : | |
| **WILLIAM JAMESON, individually and as** | : | |
| **parents and legal guardians of** | : | |
| **D.J. and T.J.** | : | |
| | : | |
| **PLAINTIFFS,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ABBOTT LABORATORIES** | : | **COMPLAINT AND JURY DEMAND** |
| | : | |
| **and** | : | |
| | : | |
| **ABBVIE INC.** | : | |
| | : | |
| **DEFENDANTS.** | : | |

Plaintiffs, Kathy and Brian Moughler, individually, and as mother, father, and natural guardians of L.M., a minor, and Tina and William Jameson, individually, and as mother, father, and legal guardians of D.J. and T.J., by their attorneys Burg Simpson Eldredge Hersh & Jardine, P.C., for their Complaint and Jury Demand allege as follows:

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiffs Kathy Moughler, Brian Moughler, and L.M. are residents and citizens of Boone County, Kentucky.

2.      Plaintiffs Tina Jameson, William Jameson, D.J., and T.J. are residents and citizens of Butler County, Ohio. D.J. and T.J. were born in Campbell and Kenton Counties, Kentucky.

3.     Defendant Abbott Laboratories is an Illinois corporation with its principal place of business in Illinois.

4.     Defendant Abbvie Inc. is a Delaware corporation with its principal place of business in Illinois.

5.     Defendant Abbvie Inc. is described on Abbott's website as a new, independent biopharmaceutical company composed of Abbott's former proprietary pharmaceutical business. On information and belief, Abbvie, Inc., is the successor in interest to one or more divisions of Abbott Laboratories that were in existence prior to its incorporation.

6.     Abbvie Inc. was incorporated on April 10, 2012, and began operations as the owner and operator of Abbott's proprietary pharmaceutical business in January of 2013.

7.     Plaintiffs allege damages in excess of $75,000.00, exclusive of interest and costs.

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332, as complete diversity exists between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000.00.

9.     This Court has personal jurisdiction over Defendants because said Defendants have regularly and purposefully transacted business and engaged in commercial activities within the State of Kentucky and this District.

10.     Venue is proper within this district pursuant to 28 U.S.C. §1391(b) and (d), because defendants have had such contacts within this District that would be sufficient to subject it to personal jurisdiction if this District were a state.  Furthermore, venue is

proper in this district as a substantial part of the events giving rise to the case occurred in this district.

## **FACTUAL BACKGROUND**

11.     Defendants manufacture, market and distribute medications containing the active ingredient valproate, valproic acid, and valproate sodium as prescription name brand pharmaceutical products.

12.     Defendants first introduced Depakene, an immediate-release formulation of valproate, to the United States market in 1978 for the treatment of seizures.

13.     Defendants subsequently introduced Depakote, an enteric coated, stable coordination complex of valproic acid and valproate sodium, to the United States market in 1983 for the treatment of seizures. Depakote was later approved for the additional indications of bipolar disorder and migraines.

14.     Defendants subsequently introduced several other strengths and formulations of valproate, valproic acid, and valproate sodium [hereinafter referred to as "valproate"] over the ensuing decades under the brand names Depakene and Depakote, and held the New Drug Applications ["NDAs"] for all dosages and formulations of Depakene and Depakote until at least 2013.

15.     On or about January of 2013, Defendant Abbott Laboratories transferred ownership of most or all of the Depakene and Depakote NDAs to Defendant Abbvie.

16.     Plaintiff Kathy Moughler consistently ingested Depakote in tablet form for the indication of control of her epilepsy. Plaintiff Kathy Moughler ingested Depakote at dosages of approximately 2000 mg per day throughout her pregnancy.

17.     Plaintiff L.M. was born in October 2003, and suffers several significant physical impairments, congenital anomalies, cognitive/behavioral impairments, and neurological disorders.

18.     Plaintiff Tina Jameson consistently ingested Depakote in tablet form for the indication of control of her epilepsy or seizure disorder. Plaintiff Tina Jameson ingested Depakote throughout her pregnancies with D.J. and with T.J.

19.     Plaintiff D.J. was born in July 1991, and suffers several significant physical impairments, congenital anomalies, cognitive/behavioral impairments, and neurological disorders.

20.     Plaintiff T.J. was born in June 1992, and suffers several significant physical impairments, congenital anomalies, cognitive/behavioral impairments, and neurological disorders.

21.     Valproate is a human teratogen, which is an agent that causes birth defects.

22.     Defendants knew or should have known by the time of Plaintiff Kathy Moughler's pregnancy in 2003, and Tina Jameson's pregnancies in 1990-1992, that valproate was a human teratogen and should not be prescribed to pregnant women, or women of childbearing years who are likely to become pregnant.

23.     In fact, the first report of valproate teratogenicity was published in the medical literature in 1980, within two years of the initial introduction of valproate to the market.

24.     In 1982, the association between valproate and neural tube defects was first documented. By 1983, a twenty-fold increase in the rate of spina bifida among

4

infants exposed to valproate during fetal development was reported in the medical literature.

25.     In 1984, "fetal valproate syndrome" became a defined term in the medical literature. Defects associated with fetal valproate syndrome include characteristic facial features, major malformations, learning disabilities, and central nervous system dysfunction, among other disorders.

26.     In particular, the occurrence of neural tube defects (such as spina bifida) from fetal exposure to valproate is estimated to be as high as 5% of all births, compared to approximately 0.1% in the general population.

27.     Other congenital defects characteristic of exposure to valproate during early pregnancy include cleft palates, cardiac defects, hypospadias, and skeletal abnormalities.

28.     Craniofacial abnormalities caused by valproate exposure in utero include such features as trigonocephaly (triangular shaped head due to premature fusion of metopic suture), a tall forehead with bilateral narrowing, flat nasal bridge, broad nasal root, anteverted nostrils, small jaw, abnormalities of the lip and philtrum, epicanthic folds, and midface hypoplasia.

29.     Skeletal defects caused by valproate exposure in utero include radial ray and tibial ray defects (deformation of bones in forearm and lower leg), multiple, missing, overlapping, or deformed fingers and toes, extremely elongated fingers or toes, as well as talipes equinovarus (club foot).

30.     Abnormalities of the eyes caused by valproate exposure in utero include such defects as bilateral congenital cataract, optic nerve hypoplasia and other defects

of the iris and cornea.

31.     Congenital heart defects caused by valproate exposure in utero include such defects as ventricular septal defects, aortic and/or pulmonary stenosis, coarctation of the aorta, and atrial septal defect.

32.     Defendants knew or should have known that women would ingest valproate as prescribed – on a daily basis – for chronic conditions, and therefore would be exposed to valproate throughout pregnancy.

33.     Many other drugs are approved for treatment of seizure disorders, bipolar disorder, and migraine, which present a lower risk of teratogenicity than valproate.

34.     Valproate increases the risk of fetal malformation compared to other anti-seizure medications, as well as other medications for the treatment of bipolar disorder and migraine to a statistically significant degree.

35.     Valproate also increases the risk of fetal malformations compared to no use of medications to a statistically significant degree.

36.     Despite the fact that valproate is a teratogen, Defendants claimed in the product labeling from 1978 until 2006 that any potential increase in birth defects from Depakote, Depakene, and other valproate products was only a possibility, and that the risk was common to the entire class of antiepileptic drugs.

37.     Defendants even denied in the product labeling for Depakote, Depakene, and other valproate products that a cause-and-effect relationship between use of valproate and birth defects had been proven, and claimed instead that the increased incidence in birth defects could be attributed to methodological problems in the data, genetic causes, or to risks arising from the epileptic condition itself.

38.     In addition to fetal malformations, valproate also dramatically increases the incidence of behavioral and cognitive dysfunction, such as lower IQ, attention deficit, autism, and neurodevelopmental delay, in comparison to all other anti-seizure medications or no use of medication.

39.     Valproate also causes an increased incidence of autism in comparison to other anti-seizure medications or no use of medication.

40.     Defendants provided no warning of these behavioral and cognitive risks to Plaintiffs Kathy Moughler or Tina Jameson at the time they ingested Depakote during their pregnancies with the minor plaintiffs.

41.     In fact, Defendants did not warn of a risk of cognitive impairment until a label change in 2011. Even then, Defendants still did not warn that Depakote should be a drug of last resort or completely contraindicated in women of childbearing potential.

42.     On July 15, 2013, nearly 10 years after plaintiff L.M.'s birth, and more than twenty years after the births of plaintiffs D.J. and T.J., Abbvie issued a Dear Doctor Letter entitled "**Important Drug Warning,**" in which Abbvie announced major safety labeling changes for Depakote, Depakene and other valproate products.

43.     In particular, Abbvie announced "**Changes to Boxed Warning,**" as well as "**Important Limitations of Use in Women of Childbearing Potential**" and "**Pregnancy Category X for Prophylaxis of Migraine Headaches**" for all valproate products.

44.     As part of the label change, Abbvie strengthened and clarified the **BLACK BOX** warning in regard to teratogenicity as follows:

**Fetal Risk**

Valproate can cause major congenital malformations, particularly neural tube defects (e.g., spina bifida). In addition, valproate can cause decreased IQ scores following in utero exposure.

Depakote and Depakote ER are therefore contraindicated in pregnant women treated for prophylaxis of migraine. Valproate should only be used to treat pregnant women with epilepsy or bipolar disorder if other medications have failed to control their symptoms or are otherwise unacceptable.

Depakote Sprinkle Capsules should only be used to treat pregnant women with epilepsy if other medications have failed to control their symptoms or are otherwise unacceptable.

Valproate should not be administered to a woman of childbearing potential unless the drug is essential to the management of her medical condition.  This is especially important when valproate use is considered for a condition not usually associated with permanent injury or death (e.g. migraine).  Women should use effective contraception while using valproate.

45.     As a result of this warning, Depakote, Depakene and other valproate products are labeled as **Category X** for pregnancy for the indication of migraine. They remain **Category D** for bipolar disorder and seizure disorder, but may only be used in pregnancy as drugs of last resort.

46.     In addition Defendants revised the **WARNINGS AND PRECAUTIONS** sections in the labels of Depakote, Depakene, and other valproate products as follows:

**Birth Defects**

- Valproate can cause fetal harm when administered to a pregnant woman. Pregnancy registry data show that maternal valproate use can cause neural tube defects and other structural abnormalities (e.g., craniofacial defects, cardiovascular malformations and malformations involving various body systems). The rate of congenital malformations among babies born to mothers using valproate is about four times higher than the rate among babies born to epileptic mothers using other anti-seizure monotherapies. Evidence suggests that folic acid supplementation prior to conception and during the first trimester of pregnancy decreases the risk for congenital neural tube defects in the general population.

**Decreased IQ Following *in utero* Exposure**

- Valproate can cause decreased IQ scores following *in utero* exposure. Published epidemiological studies have indicated that children exposed to valproate *in utero* have lower cognitive test scores than children exposed *in utero* to either another antiepileptic drug or to no antiepileptic drugs. The largest of these studies is a prospective cohort study conducted in the United States and United Kingdom that found that children with prenatal exposure to valproate (n=62) had lower IQ scores at age 6 (97 [95% C.I. 94-101]) than children with prenatal exposure to the other antiepileptic drug monotherapy treatments evaluated: lamotrigine (108 [95% C.I. 105–110]), carbamazepine (105 [95% C.I. 102–108]), and phenytoin (108 [95% C.I. 104–112]). It is not known when during pregnancy cognitive effects in valproate-exposed children occur. Because the women in this study were exposed to antiepileptic drugs throughout pregnancy, whether the risk for decreased IQ was related to a particular time period during pregnancy could not be assessed.

- Although all of the available studies have methodological limitations, the weight of the evidence supports the conclusion that valproate exposure *in utero* can cause decreased IQ in children.

- In animal studies, offspring with prenatal exposure to valproate had malformations similar to those seen in humans and demonstrated neurobehavioral deficits.

- Valproate is contraindicated during pregnancy in women being treated for prophylaxis of migraine headaches.  Women with epilepsy or bipolar disorder who are pregnant or who plan to become pregnant should not be treated with valproate unless other treatments have failed to provide adequate symptom control or are otherwise unacceptable.  In such women, the benefits of treatment with valproate may still outweigh the risks.

**Use in Women of Childbearing Potential**

- …It is not known whether the risk of neural tube defects or decreased IQ in the offspring of women receiving valproate is reduced by folic acid supplementation. Dietary folic acid supplementation both prior to conception and during pregnancy should be routinely recommended for patients using valproate.

47.    Thus Defendants waited 30 years to warn that Depakote is a drug of last resort during pregnancy, and that it is completely contraindicated during pregnancy for the treatment of migraine.

48.    However, other less hazardous anti-seizure drugs have included this

warning since the early 1980's, including Defendant's own anti-seizure drugs, trimethadione (Tridione) and paramethadione (Paradion), which contained a **BLACK BOX** warning stating,

> **"BECAUSE OF ITS POTENTIAL TO PRODUCE FETAL MALFORMATIONS AND SERIOUS SIDE EFFECTS, [drug name] SHOULD ONLY BE UTILIZED WHEN OTHER LESS TOXIC DRUGS HAVE BEEN FOUND INEFFECTIVE…"**

49.     Many other anti-seizure drugs approved prior to 1995 clearly warned that due to potential serious side effects, they should be prescribed only when patients' conditions had proven refractory to treatment with other drugs.  Examples include:

> 1) phenacemide (Phenurone) - indicated only for seizures "refractory to other drugs" or when "other available antiepileptics have been found to be ineffective in satisfactorily controlling seizures;"
>
> 2) mephenytoin (Mesantoin) - indicated for seizures "in those patients who have been refractory to less toxic anticonvulsants"; "should be used only after safer anticonvulsants have been given an adequate trial and have failed;"
>
> 3) methsuximide (Celontin) - indicated for control of absence (petit mal) seizures that are refractory to other drugs;" and,
>
> 4) felbamate (Felbatol) - "recommended for use only in those patients who respond inadequately to alternative treatments."

50.     Yet not until 2013 did Defendants revise the labels for Depakote and other valproate products to warn that they should not be a first line medication during pregnancy for treatment of seizure disorder.

51.     Defendants failed to warn for over thirty years that valproate should be completely contraindicated and/or a drug of last resort during pregnancy because Defendants sought to exploit the marketing potential for valproate products, and did not want to risk secondary status for the marketing segment of women of childbearing years. In particular, Defendants fought to maintain market share during the three

decades that valproate in its various formulations had no generic competition, heedless of the risk of teratogenicity when prescribed to women of childbearing years.

52.     With an adequate warning, Plaintiffs Kathy Moughler and Tina Jameson and their physicians would have pursued a safer, more practical, alternative treatment option to treat their seizure disorder, including but not limited to ethotoin (Peganone) and phenytoin (Dilantin), both of which pose much less risk of teratogenicity with comparable or better efficacy.

53.     Moreover, had either Plaintiff Kathy Moughler, who consistently ingested 2000 mg/day of Depakote during her pregnancy with L.M., or Plaintiff Tina Jameson, who consistently ingested Depakote during her pregnancies with D.J and T.J., been warned of the increased risk posed by higher doses of valproate, they would have exercised other treatment options.

54.     Plaintiff L.M. was born in October 2003 and diagnosed with severe physical, cognitive, behavioral, and neurologic abnormalities.

55.     Plaintiff D.J. was born in July 1991 and diagnosed with severe physical, cognitive, behavioral, and neurologic abnormalities.

56.     Plaintiff T.J. was born in June 1992 and diagnosed with severe physical, cognitive, behavioral, and neurologic abnormalities.

57.     Plaintiff L.M.'s physical abnormalities include torticollis, blocked tear duct (requiring surgery), a deformed ear, slightly low-set ears, webbed toes, left-sided body weakness, eye drifts, tubes in ears, and ankyloglossia. Plaintiff L.M.'s physical defects have required surgical treatment and will continue to require medical treatment, including surgery and therapy in the future.

58.     Plaintiff L.M.'s behavioral and cognitive impairments include—Attention Deficit Hyperactivity Disorder, developmental delay, sensory processing disorder, anxiety / nervous disorder, and encephalopathy. As a result of Plaintiff L.M.'s behavioral and cognitive impairments, he has received individualized educational assistance and academic support; speech therapy; and psychiatric care, treatment, and therapy. And he will continue to require many of these services in the future.

59.     Plaintiff L.M. requires assistance caring for his activities of daily living and personal hygiene. He will require medical and psychiatric care, occupational therapy, physical therapy, and related assistance throughout his life due to the injuries caused by in utero exposure to Depakote.

60.     The congenital malformations and deficits suffered by Plaintiff L.M. as a result of his exposure to the teratogenic effects of Depakote in utero include permanent and substantial deficits that will permanently limit his ability to independently care for himself and perform life-sustaining activities.

61.     Due to the injuries caused by his in utero exposure to Depakote, Plaintiff L.M. will not be able to live independently and he will be dependent upon Plaintiffs Kathy and Brian Moughler throughout his life.

62.     Plaintiff D.J.'s physical abnormalities include missing middle brain, low muscle tone, lazy eyes, dysgenesis of the corpus collosum, mild colpocephaly and parallel configuration of bodies of the lateral ventricles, small frontal horns, multiple foci of heptopic gray matter lining the lateral ventricles, static encephalopathy, arachnoid cyst at the level of the formen of Monro. Plaintiff D.J.'s physical defects have required medical care and treatment will continue to require medical treatment in the future.

63.    Plaintiff D.J.'s behavioral and cognitive impairments include— neurological problems, motor skill and developmental delays, and low verbal skills.  Plaintiff D.J. cannot live independently; he requires assistance with managing money and making change, he lacks social skills, and he needs assistance in finding employment.  Plaintiff D.J. has had speech problems, has impaired language memory functioning, has low average expressive language skills, and is mentally challenged. He had to repeat kindergarten and had an Individualized Education Plain (IEP) from third grade on. As a result of Plaintiff D.J.'s behavioral and cognitive impairments, he has received individualized educational assistance and academic support; and speech therapy. And he will continue to require care and assistance in the future.

64.    Plaintiff D.J. requires assistance caring for his activities of daily living and personal hygiene. He will require medical care and related assistance throughout his life due to the injuries caused by in utero exposure to Depakote.

65.    The congenital malformations and deficits suffered by Plaintiff D.J. as a result of his exposure to the teratogenic effects of Depakote in utero include permanent and substantial deficits that will permanently limit his ability to independently care for himself and perform life-sustaining activities.

66.    Due to the injuries caused by his in utero exposure to Depakote, Plaintiff D.J. will not be able to live independently and he will be dependent upon Plaintiffs Tina and William Jameson throughout his life.

67.    Plaintiff T.J.'s physical abnormalities include low muscle tone, weakness in the right arm, precocious puberty, and jaw and teeth problems including teeth coming in at the wrong places and out the front of her gums. Plaintiff T.J.'s physical defects

have required medical care and treatment and will continue to require medical care and treatment in the future.

68.     Plaintiff T.J.'s behavioral and cognitive impairments include low intelligence quotient, motor and developmental delays, and mental retardation. She has received individualized educational assistance and academic support; repeated kindergarten; and will not be able to work or live independently. And she will continue to require many of these services in the future, including attending a center for socialization.

69.     Plaintiff T.J. requires assistance caring for her activities of daily living and personal hygiene. She will require medical care, occupational therapy, physical therapy, and related assistance throughout her life due to the injuries caused by in utero exposure to Depakote.

70.     The congenital malformations and deficits suffered by Plaintiff T.J. as a result of her exposure to the teratogenic effects of Depakote in utero include permanent and substantial deficits that will permanently limit her ability to independently care for herself and perform life-sustaining activities.

71.     Due to the injuries caused by her in utero exposure to Depakote, Plaintiff T.J. will not be able to live independently and she will be dependent upon Plaintiffs Tina and William Jameson throughout her life.

## THE FEDERAL REQUIREMENTS

72.     Pursuant to federal law, the introduction of a drug that is adulterated or misbranded into interstate commerce is prohibited. See, 21 U.S.C. § 331.

73.     Pursuant to federal law, a drug is deemed to be adulterated if, among other things, it fails to meet established performance standards, or if the methods, facilities or controls used for its manufacture packing, storage or installation are not in conformity with federal requirements. See, 21 U.S.C. § 351.

74.     Pursuant to federal law, a drug is deemed to be misbranded if, among other things, its labeling is false or misleading in any particular, or if it is dangerous to health when used in the dosage or manner prescribed, recommended or suggested in the labeling thereof. See, 21 U.S.C. § 352.

75.     Pursuant to federal law, a drug is deemed to be misbranded, unless its labeling bears adequate directions for use and adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health, or against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users. See, 21 U.S.C. § 352(f).

76.     Pursuant to federal law, if a drug is alleged to be misbranded because the labeling or advertising is misleading, then in determining whether the labeling or advertising is misleading there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling or advertising fails to reveal material facts with respect to consequences which may result from the use of the drug in the manner prescribed for use in the labeling or advertisement. See, 21 U.S.C. § 321(n).

77.     Pursuant to FDA regulation, all advertisements for any prescription drug shall present a true statement of information in brief summary relating to side effects,

contraindications (including  side effects, warnings, precautions, and contraindications and include any such information under such headings as cautions, special considerations, important notes, etc.) and effectiveness (except for those exempted by paragraph (e)(2) which are limited to reminder advertisements, advertisements for bulk-sale drugs, and advertisements of prescription-compounding drugs). 21 CFR § 202.1(e)(1).

78.    Pursuant to FDA regulation, an advertisement does not satisfy the requirement that it present a "true statement" of information in brief summary relating to side effects, contraindications, and effectiveness if it is false or misleading with respect to side effects, contraindications, or effectiveness; if it fails to present a fair balance between information relating to side effects and contraindications and information relating to effectiveness of the drug; or if it fails to reveal material facts regarding consequences from use recommended or suggested in the advertisement. 21 CFR  § 202.1(e)(5).

79.    Pursuant to FDA regulation, an advertisement for a prescription drug is false, lacking in fair balance, or misleading if, among other reasons, it represents or suggests in a manner not approved or permitted for use in the labeling that drug is better, more effective, useful in a broader range of conditions or patients safer, has fewer or less serious side effects or contraindications than has been demonstrated by substantial evidence or clinical experience; contains a drug comparison that represents a drug is safer or more effective than the other when it has not been demonstrated to be by substantial evidence or clinical experience; contains information previously regarded as valid but which has been proven invalid by contrary and more credible recent

information; or represents or suggests that a drug is safer than it has been demonstrated to be by selective information from any source in a way that makes the drug appear to be safer than has been demonstrated. 21 CFR § 202.1(e)(6).

80.   Pursuant to FDA regulation, adverse events associated with a drug must be reported to the FDA as soon as possible but no later than 15 days after the initial receipt by the manufacturer of the adverse drug experience that is both serious and unexpected (15-day Alert Report). Manufacturers are responsible for conducting an investigation of each adverse event, and must evaluate the cause of the adverse event. 21 CFR § 310.305; 21 CFR § 314.80.

81.   Pursuant to FDA regulation, manufacturers must promptly investigate all serious, unexpected adverse drug experiences that are the subject of the 15-day Alert Reports and shall submit follow-up reports within 15 calendar days of receipt of new information or as requested by the FDA. 21 CFR § 310.305; 21 CFR § 314.80.

82.   Pursuant to FDA regulation, if additional information is not obtainable, records should be maintained of the unsuccessful steps taken to seek additional information. 21 CFR § 310.305; 21 CFR § 314.80.

83.   Pursuant to FDA regulation, each report submitted must identify its contents such as "15-day Alert report," or "15-day Alert report followup." 21 CFR § 310.305; 21 CFR § 314.80.

84.   Pursuant to FDA regulation, in the case of post marketing reporting of adverse drug experiences, the manufacturer must report each adverse drug experience at quarterly intervals for three (3) years from the date of approval of the application, and then at annual intervals. 21 CFR § 314.80.

85.     Pursuant to FDA regulation, each periodic report is required to contain (*a*) a narrative summary and analysis of the information in the report and an analysis of the 15-day Alert reports submitted during the reporting interval (*b*) an Adverse Reaction Report for each adverse drug experience not reported already reported under 21 CFR § 314.80 paragraph (c)(1)(i) (Post marketing 15-day Alert report) and (*c*) a history of actions taken since the last report because of adverse drug experiences (for example, labeling changes or studies initiated). 21 CFR § 314.80.

86.     Pursuant to FDA regulation, a 15-day Alert based on information from the scientific literature is required to be accompanied by a copy of the published article. The 15-day reporting requirements of 21 CFR § 314.80 paragraph (c)(1)(i) (i.e., serious, unexpected adverse drug experiences) apply to reports found in scientific and medical journals either as case reports of as the result of a formal clinical trial.

87.     Pursuant to FDA regulation, the labeling for human prescription drugs must be informative and accurate and neither promotional in tone nor false or misleading in any particular.  The labeling must also be updated when new information becomes available that causes the labeling to become inaccurate, false, or misleading. 21 CFR § 201.56(a).

88.     Pursuant to FDA regulation, the contraindications section of the label shall describe those situations in which the drug should not be used because any risk of use clearly outweighs any possible benefit.  21 CFR § 201.80(d).

89.     Pursuant to FDA regulation, the warnings section of the label shall describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur. The labeling shall be

revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved. 21 CFR § 201.80(e).

### FIRST CAUSE OF ACTION

**Strict Products Liability**
**Design Defect**
**(Moughlers and L.M.)**

90.    Plaintiffs hereby incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

91.    Defendants are the manufacturers, designers, marketers, distributors and sellers of Depakote.

92.    The Depakote manufactured, designed, marketed, distributed and sold by Defendants was expected to and did reach consumers, including Plaintiff Kathy Moughler, without any alterations or changes.

93.    The Depakote manufactured, designed, marketed, distributed and sold by Defendants was defective in design or formulation, because when it left the hands of the Defendants, the foreseeable risks of the product exceeded the benefits associated with its design or formulation.

94.    The Depakote manufactured, designed, marketed, distributed and sold by Defendants was defective in design or formulation, because when it left the hands of the Defendants, it was more dangerous than an ordinary consumer would expect.

95.    The foreseeable risks of Depakote include an increase in the occurrence of major congenital malformations from fetal exposure to Depakote, the magnitude of which is dramatic in terms of the number of women exposed, the incidence rate, and the devastating nature of resulting harm to the fetus.

96.     The fact that harm such as that suffered by Plaintiff L.M. will occur from use of Depakote by women of childbearing age is completely foreseeable because (1) Depakote is a known teratogen; (2) Defendants have not prohibited Depakote's use in women of childbearing years; (3) Defendants did not warn against use during pregnancy or limit its use to a drug of last resort; and (4) half of all pregnancies in the United States are unplanned, and few contraception measures are 100% effective.

97.     The likelihood that fetal death and injury would result from maternal use of Depakote is very high, based upon relative risk estimates of 6 or more, and studies confirming an incidence rate for major malformations of greater than 30% for infants born of women ingesting higher dosages of valproate.

98.     Depakote as manufactured, designed, marketed, distributed, and sold by Defendants is much more dangerous than an ordinary consumer would expect, as maternal use of Depakote during fetal development creates a very high risk of fetal death or major congenital malformations, as well as cognitive, developmental, neurological and behavioral dysfunction.

99.     At the time Defendants manufactured, designed, marketed, distributed, and sold Depakote to Plaintiff Kathy Moughler, safer, more practical, alternative treatment options were available to treat her seizure disorder, including but not limited to prescription drug alternatives such as ethotoin (Peganone) and phenytoin (Dilantin), both of which pose less risk of teratogenicity with comparable or better efficacy.

100.    The Depakote manufactured, designed, marketed, distributed, and sold by Defendants was not unavoidably unsafe, as alternative formulations for anti-seizure

medications were available with comparable or better efficacy that did not pose the same teratogenic risk.

101.   Moreover, the Depakote manufactured, designed, marketed, distributed, and sold by Defendants was not unavoidably unsafe, because no use of any anti-seizure medication during pregnancy is safer than use of Depakote, and thus the teratogenic risks of Depakote could be avoided entirely during pregnancy.

102.   Based upon the foregoing, the Depakote manufactured, designed, marketed, distributed and sold by Defendants was defective in design at the time it left the Defendants' control.

103.   As a direct and proximate result of the defective design of Depakote consumed by Plaintiff Kathy Moughler and/or the Defendants' failure to comply with applicable federal requirements, Plaintiff L.M. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic, cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

104.   In addition, as a direct and proximate result of the defective design of Depakote consumed by Plaintiff Kathy Moughler and /or the Defendants' failure to comply with applicable federal requirements, Plaintiffs Kathy and Brian Moughler have suffered individual damages, including but not limited to economic harm and loss of consortium due to the injuries caused to Plaintiff L.M. and will continue to suffer said damages, harm and loss of consortium in the future.

105.    Defendants' acts were motivated by financial gain while the adverse consequences of the conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

## SECOND CAUSE OF ACTION

### Strict Products Liability
### Defect Due To Inadequate Warning
### (Moughlers and L.M.)

106.    Plaintiffs hereby incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

107.    Defendants are the manufacturers, designers, marketers, distributors, and sellers of Depakote.

108.    It was reasonably foreseeable that women of childbearing years, such as Plaintiff Kathy Moughler, would become pregnant while on Depakote, and that a very high percentage of children exposed to Depakote in utero would suffer devastating teratogenic effects as a result.

109.    The Depakote manufactured, designed, marketed, distributed and sold by Defendants was defective due to inadequate warning or instruction because at the time it left the control of Defendants and was supplied to Plaintiff Kathy Moughler, Defendants knew or should have known that their product was unreasonably dangerous, as confirmed by the extensive body of published literature and its own internal data, because Depakote substantially and significantly increases the risk of teratogenic effects compared to other treatment options for seizure control.

110.   Despite the fact that Defendants knew or should have known about the increased risk of teratogenicity with Depakote as compared to other treatment options for seizure control, Defendants failed to exercise reasonable care to adequately warn of the increased teratogenicity risk. In fact, Defendants denied in the Depakote product label at the time of Plaintiff Kathy Moughler's product use that the association between Depakote and birth defects was causal.

111.   The Depakote manufactured and supplied by Defendants was defective due to inadequate warning or instruction because at the time it left the control of Defendants and was supplied to Plaintiff Kathy Moughler, Defendants knew or should have known that their product was unreasonably dangerous, as confirmed by the extensive body of published literature and its own internal data, because higher doses of Depakote, such as the 2000 mg ingested daily by Plaintiff, substantially and significantly increases the risk of teratogenic effects compared to lower doses.

112.   Despite the fact that Defendants knew or should have known about the increased risk of teratogenicity with higher doses of Depakote as compared to lower doses (such as doses under 1000 mg/day), Defendants failed to exercise reasonable care to adequately warn of the increased teratogenicity risk with higher doses of Depakote.  In fact, Defendants made no reference in the Depakote product label to the dose-response relationship between Depakote and severe congenital anomalies.

113.   The Depakote manufactured and supplied by Defendants was defective due to inadequate warning or instruction because at the time it left the control of Defendants and was supplied to Plaintiff Kathy Moughler, Defendants knew or should have known that their product was unreasonably dangerous, as confirmed by the

extensive body of medical literature and Defendants' internal data, because ingestion of Depakote substantially and significantly increases the risk of impaired cognitive function, neurodevelopmental delay, autism and autistic spectrum disorders.

114.   Despite the fact that Defendants knew or should have known about the increased risk of impaired cognitive function, neurodevelopmental delay, autism and autistic spectrum disorders caused by in utero exposure to Depakote, Defendants failed to exercise reasonable care to adequately warn of this increased risk. In fact, Defendants made no reference to any such increased risk in the Depakote product label at the time of Plaintiff's product use.

115.   The Depakote manufactured and supplied by Defendants was defective due to inadequate warning or instruction because at the time it left the control of Defendants and was supplied to Plaintiff Kathy Moughler, Defendants knew or should have known that their product was unreasonably dangerous for any use by women of childbearing years, as confirmed by the extensive body of medical literature and Defendants' internal data, because ingestion of Depakote substantially and significantly increases the risk of severe teratogenic effects to the developing fetus, the harm occurs in the very earliest weeks of pregnancy (often before the existence of the pregnancy is known), more than half of all pregnancies in the United States are unplanned, and Depakote cannot be readily discontinued without causing adverse withdrawal effects.

116.   Despite the fact that Defendants knew or should have known that Depakote should be completely contraindicated for women of childbearing years, Defendants failed to exercise reasonable care to adequately warn of the necessity of prohibiting women of childbearing years from ingesting this drug. Instead, Defendants

denied that a cause-and-effect relationship had been proven between Depakote and birth defects, described the potential for teratogenicity as a class-wide effect, and advised that the benefits and the risks of using Depakote should be weighed (based upon the inaccurate and incomplete information contained in the product label), without revealing that other drugs in the class offered safer alternatives for seizure control in women of childbearing years.

117.   The Depakote manufactured and supplied by Defendants was also defective due to inadequate warning or instruction because at the time it left the control of Defendants and was supplied to Plaintiff Kathy Moughler, Defendants knew or should have known that their product was unreasonably dangerous for any use by women of childbearing years, as confirmed by the extensive body of medical literature and Defendants' internal data, when compared to no treatment for seizure disorder during pregnancy. Yet Defendants specifically claimed in the product label that no cause-and-effect relationship had been established between the use of Depakote and birth defects, and further claimed: "the epileptic condition itself may be more important than drug [i.e. Depakote] therapy in contributing to congenital abnormalities."

118.   Despite the fact that Defendants knew or should have known that using Depakote during pregnancy created a substantially greater risk to the fetus than no treatment for seizure disorder, Defendants failed to exercise reasonable care to adequately warn women and their doctors of the unreasonable risk posed by use of Depakote during pregnancy.

119.   The Depakote manufactured and supplied by Defendants was also defective due to inadequate warning or instruction because at the time it left the control

of Defendants and was supplied to Plaintiff Kathy Moughler, Defendants knew or should have known that their product was unreasonably dangerous and should be completely contraindicated during pregnancy, or should be a drug of last resort to be used during pregnancy only if all other available medications had been found to be ineffective in controlling seizures.

120.   The Depakote manufactured and supplied by Defendants was also defective due to inadequate post-marketing warning or instruction, because after Defendants knew or should have known of the substantially increased risks as described above, Defendants failed to provide adequate post-market or post-approval warnings to consumers and/or their health care providers, which they have authority to do as the holder of the NDAs, and failed to revise the Depakote label to warn of the serious and substantially increased risk of fetal death and major congenital malformations caused by Depakote as compared to no use of anti-seizure medications, or compared to other anti-seizure medications when taken as prescribed, when taken in higher dosages, or when combined in polytherapy; nor did Defendants warn Plaintiff Kathy Moughler or her physicians of the increased risk of cognitive impairment, neurodevelopmental delay, autism and autistic spectrum disorders, that alternative safer options were available, and that Depakote should not be ingested by women of childbearing years or only when all other treatment options had failed.

121.   The significantly increased risk of harm from the teratogenic properties of Depakote is not an open and obvious danger or a matter of common knowledge.

122.   As a direct and proximate result of the use of Depakote as manufactured, designed, marketed, distributed, and sold by Defendants and/or their failure to comply

with applicable federal requirements, Plaintiff L.M. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic, cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

123.   In addition, as a direct and proximate result of the use of defective Depakote and/or the Defendants' failure to comply with applicable federal requirements, Plaintiffs Kathy and Brian Moughler have suffered individual damages, including but not limited to economic harm and loss of consortium due to the injuries caused to L.M. and will continue to suffer said damages, harm, and loss of consortium in the future.

124.   Defendants' acts were motivated by financial gain while the adverse consequences of the conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

## THIRD CAUSE OF ACTION

### Negligence
### (Moughlers and L.M.)

125.   Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

126.   Defendants had a duty to exercise reasonable care in the manufacture, design, distribution, marketing, labeling and sale of Depakote, including a duty to ensure that Depakote did not pose a significantly increased risk of bodily harm and adverse events.

127.   Defendants failed to exercise ordinary care in the design, formulation, manufacture, design, distribution, marketing, labeling and sale of Depakote in that Defendants knew, or should have known, that their products caused such significant bodily harm or death and was not safe for use by consumers.

128.   Defendants also failed to exercise ordinary care in the labeling of Depakote, and failed to issue to consumers and/or their health care providers adequate warnings of the increased risk of serious bodily injury or death due to the use of Depakote as compared to other alternative treatments.

129.   Despite the fact that Defendants knew or should have known that Depakote posed a serious and increased risk of bodily harm to consumers, Defendants continued to manufacture and market Depakote for use by consumers, including women of childbearing years such as Plaintiff Kathy Moughler, and continued to knowingly withhold critical safety information, such as the increased risk at higher doses, the increased risk compared to other treatment options, the increased risk compared to no treatment for seizures, and the increased risk of cognitive and neuropsychological disorders.  Further Defendants failed to warn that Depakote should either be completely contraindicated during pregnancy or used only when all other treatment options had proven ineffective in controlling seizures.

130.   Defendants knew or should have known that consumers, such as Plaintiff Kathy Moughler, would foreseeably ingest Depakote during pregnancy and that their children would suffer injury as a result of Defendants' failure to exercise reasonable care as described above.

131.   As a direct and proximate result of Defendants' negligence and/or the failure to comply with applicable federal requirements, Plaintiffs Kathy Moughler and L.M. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic, cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

132.   In addition, as a direct and proximate result of Defendants' negligence and/or the failure to comply with applicable federal requirements, Plaintiffs Kathy and Brian Moughler have suffered individual damages, including but not limited to economic harm and loss of consortium due to the injuries caused to L.M. and will continue to suffer said damages, harm and loss of consortium in the future.

133.   Defendants' acts were motivated by financial gain while the adverse consequences of the conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

### FOURTH CAUSE OF ACTION

**Negligent Misrepresentation and Fraud**
**(Moughlers and L.M.)**

134.   Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

135.   Defendants manufacture, design, market, label, distribute, and sell Depakote.

136.   Defendants have a duty not to deceive consumers and their physicians, including Plaintiff Kathy Moughler, about Depakote.

137.   Defendants made representations to Plaintiff Kathy Moughler and her physicians regarding the character and/or quality of Depakote for guidance in their decision to select Depakote for Plaintiff's use.

138.   Specifically, Defendants represented that their products were just as safe or even safer than other prescription drugs for treatment of seizure disorder available on the market.

139.   Defendants knew or should have known that such statements were false.

140.   Defendants stated that any risk of teratogenicity with Depakote was a class-wide risk common to anti-seizure medications in general.

141.   Defendants knew or should have known that this statement was false, and that Depakote posed a dramatically increased risk of teratogenicity compared to other anti-seizure drugs.

142.   Further, Defendants denied that the relationship between Depakote and birth defects was causal, and instead claimed that the association between Depakote and birth defects in the medical literature arose from intrinsic methodological problems, and that genetic risks and the risks posed by epilepsy itself were of greater teratogenicity concern than Depakote.

143.   Defendants knew or should have known that these statements were false, and that the relationship between Depakote and birth defects was causal, and that genetic factors and epilepsy itself did not create a greater risk of teratogenicity than Depakote.

30

144.    Defendants had actual or constructive knowledge based upon studies, published reports, and clinical experience of the dangerous teratogenic effects of Depakote, and of the fact that these risks were substantially greater than risks associated with other anti-seizure treatments or no treatment at all.

145.    Defendants negligently and/or intentionally misrepresented this information in Depakote's labeling, promotions and advertisements, in order to avoid losses and maximize profits in their sales to consumers and instead labeled, promoted, and advertised their product as being just as safe and effective as other anti-seizure medications.

146.    In supplying this false information, Defendants failed to exercise reasonable care or competence in obtaining safety information concerning Depakote and in communicating this information to their intended recipients, including Plaintiff Kathy Moughler and her physicians.

147.    Defendants had a duty to disclose to Plaintiff Kathy Moughler and her physicians, as well as to the public, that Depakote was not safe for use by women of childbearing years due to its teratogenic effects, or should only be used when all other treatment options had proven ineffective.

148.    Defendants also had a duty to disclose the dose-response relationship between Depakote and birth defects and the increased risk of cognitive deficits, neurodevelopmental delay, behavioral disorders, autism and autistic spectrum disorder caused by use of Depakote.

149.    Defendants did not disclose any of the above information to Plaintiffs.

150.   Plaintiff Kathy Moughler and her physicians reasonably relied to Plaintiffs' detriment upon Defendants' misrepresentations and/or omissions concerning the serious risks posed by Depakote in the product's labeling, advertisements and promotions. Plaintiff and her physicians reasonably relied to her detriment upon Defendants' representations that Depakote was just as safe and effective as other methods of treating and preventing seizures, or just as safe as no treatment of seizures during pregnancy.

151.   Defendants' representations that Defendants' labeling, advertisements and promotions fully and accurately described all known risks of the product were false.

152.   Had Plaintiff Kathy Moughler or her physicians known of Defendants' concealment of the true facts—that Depakote was more dangerous for use by women of childbearing years than other anti-seizure medications or no use of antiseizure medications—Plaintiff would not have been prescribed or used Depakote.

153.   As a direct and proximate result of Defendants' negligent or intentional misrepresentations and/or the failure to comply with applicable federal requirements, Plaintiff L.M. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic, cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

154.   In addition, as a direct and proximate result of Defendants' negligent or intentional misrepresentation and/or the failure to comply with applicable federal requirements, Plaintiffs Kathy and Brian Moughler have suffered individual damages,

including but not limited to economic harm and loss of consortium due to the injuries caused to L.M., and will continue to suffer said damages, harm and loss of consortium in the future.

155.   Defendants' acts were motivated by financial gain while the adverse consequences of the conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

### FIFTH CAUSE OF ACTION

**Breach of Express Warranty**
**(Moughlers and L.M.)**

156.   Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

157.   Defendants expressly warranted that the relationship between Depakote and birth defects "cannot be regarded as a cause-and-effect relationship."

158.   The Depakote manufactured and sold by Defendants did not conform to this express representation because Depakote clearly is a human teratogen when taken in the recommended dosages.

159.   As a direct and proximate result of Defendants' breach of express warranty and/or the failure to comply with applicable federal requirements, Plaintiff L.M. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic, cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages,

and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

160.    In addition, as a direct and proximate result of Defendants' breach of express warranty and/or the failure to comply with applicable federal requirements, Plaintiffs Kathy and Brian Moughler have suffered individual damages, including but not limited to economic harm and loss of consortium due to the injuries caused to L.M. and will continue to suffer said damages, harm, and loss of consortium in the future.

161.    Defendants' acts were motivated by financial gain while the adverse consequences of the conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

## SIXTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability
### (Treatment of Seizure Disorder During Pregnancy)
### (Moughlers and L.M.)

162.    Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

163.    At the time Defendants manufactured, marketed, sold, distributed, and/or supplied Depakote, Defendants impliedly warranted that the Depakote was just as safe for the treatment of seizure disorder during pregnancy as any other drugs in the anti-seizure class.

164.    At the time Defendants manufactured, marketed, sold, distributed, and/or supplied Depakote, Defendants knew or should have known that treatment of seizure

34

disorders during pregnancy was within the ordinary purpose for which Depakote was to be used.

165.    Defendants impliedly warranted Depakote to be merchantable and safe for such use during pregnancy by claiming that the teratogenicity risks of Depakote were presumed to be the same as with other anti-seizure medications, when in fact the risks with Depakote were substantially greater.

166.    Contrary to these implied warranties of merchantability, Depakote was not of merchantable quality or safe for its intended use during pregnancy, because Depakote is unreasonably dangerous as described herein.

167.    As a direct and proximate result of Defendants' breach of implied warranty of merchantability and failure to comply with applicable federal requirements, L.M. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic, cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

168.    In addition, as a direct and proximate result of Defendants' breach of implied warranty of merchantability and failure to comply with applicable federal requirements, Plaintiffs Kathy and Brian Moughler have suffered individual damages, including but not limited to economic harm and loss of consortium due to the injuries caused to L.M. and will continue to suffer said damages, harm, and loss of consortium in the future.

169.    Defendants' acts were motivated by financial gain while the adverse

consequences of the conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

## SEVENTH CAUSE OF ACTION

### Breach of Implied Warranty of Fitness
### (Moughlers and L.M.)

170.   Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

171.   At the time Defendants manufactured, designed, marketed, sold, and/or distributed Depakote, Defendants had actual or constructive knowledge that consumers would choose Defendants' product, not only for its ordinary purpose (the treatment of seizure disorder), but also for the particular purpose of treating seizure disorder during pregnancy.

172.   Defendants impliedly warranted Depakote to be just as fit and safe for this particular purpose as any other anti-seizure medication.

173.   Contrary to this implied warranty of fitness, Depakote was not fit or safe for Plaintiff's particular use, because Depakote was unreasonably dangerous compared to other available anti-seizure medications as previously described.

174.   As a direct and proximate result Defendants' breach of implied warranty of fitness and/or failure to comply with applicable federal requirements, Plaintiff L.M. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic, cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages,

and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

175.   In addition, as a direct and proximate result of Defendants' breach of implied warranty of fitness and/or failure to comply with applicable federal requirements, Plaintiffs Kathy and Brian Moughler have suffered individual damages, including but not limited to economic harm and loss of consortium due to the injuries caused to L.M., and will continue to suffer said damages, harm, and loss of consortium in the future.

176.   Defendants' acts were motivated by financial gain while the adverse consequences of the conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

## EIGHTH CAUSE OF ACTION

### Loss of Consortium
### Medical and Related Expenses
### (Moughlers)

177.   Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

178.   As a direct and proximate result of the defective condition of Defendants' product, Depakote, Defendants' wrongful conduct, negligence, breach of warranties, negligent misrepresentation and fraud, and/or failure to comply with applicable federal requirements, as fully described above, Plaintiffs Kathy and Brian Moughler, as the parents and natural guardians of L.M., have incurred significant economic harm, including but not limited to medical and medication expenses, caregiving expenses, and

lost earnings, due to the injuries suffered by L.M. from in utero exposure to Depakote, and will continue to suffer such damages in the future.

179.    As a direct and proximate result of the actions by Defendants as described above and the defective condition of Defendants' product, Depakote, Defendants' wrongful conduct, negligence, breach of warranties, negligent misrepresentation and fraud, and/or the Defendants' failure to comply with applicable federal requirements, as fully described above, Plaintiffs Kathy and Brian Moughler, as the parents and natural guardians of L.M., have incurred a loss of parental consortium, including but not limited to the loss of the services, love, companionship, society, comfort, and solace of L.M., and the injury to or destruction of the parent-child relationship, due to the injuries suffered by L.M. from in utero exposure to Depakote, and will continue to suffer such losses in the future.

180.    Defendants' acts were motivated by financial gain while the adverse consequences of their conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

## NINTH CAUSE OF ACTION

### Strict Products Liability
### Design Defect
### (Jamesons and D.J.)

181.    Plaintiffs hereby incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

182.    Defendants are the manufacturers, designers, marketers, distributors and sellers of Depakote.

183.    The Depakote manufactured, designed, marketed, distributed and sold by Defendants was expected to and did reach consumers, including Plaintiff Tina Jameson, without any alterations or changes.

184.    The Depakote manufactured, designed, marketed, distributed and sold by Defendants was defective in design or formulation, because when it left the hands of the Defendants, the foreseeable risks of the product exceeded the benefits associated with its design or formulation.

185.    The Depakote manufactured, designed, marketed, distributed and sold by Defendants was defective in design or formulation, because when it left the hands of the Defendants, it was more dangerous than an ordinary consumer would expect.

186.    The foreseeable risks of Depakote include an increase in the occurrence of major congenital malformations from fetal exposure to Depakote, the magnitude of which is dramatic in terms of the number of women exposed, the incidence rate, and the devastating nature of resulting harm to the fetus.

187.    The fact that harm such as that suffered by Plaintiff D.J. will occur from use of Depakote by women of childbearing age is completely foreseeable because (1) Depakote is a known teratogen; (2) Defendants have not prohibited Depakote's use in women of childbearing years; (3) Defendants did not warn against use during pregnancy or limit its use to a drug of last resort; and (4) half of all pregnancies in the United States are unplanned, and few contraception measures are 100% effective.

188.    The likelihood that fetal death and injury would result from maternal use of Depakote is very high, based upon relative risk estimates of 6 or more, and studies confirming an incidence rate for major malformations of greater than 30% for infants

39

born of women ingesting higher dosages of valproate.

189.   Depakote as manufactured, designed, marketed, distributed, and sold by Defendants is much more dangerous than an ordinary consumer would expect, as maternal use of Depakote during fetal development creates a very high risk of fetal death or major congenital malformations, as well as cognitive, developmental, neurological and behavioral dysfunction.

190.   At the time Defendants manufactured, designed, marketed, distributed, and sold Depakote to Plaintiff Tina Jameson, safer, more practical, alternative treatment options were available to treat her seizure disorder, including but not limited to prescription drug alternatives such as ethotoin (Peganone) and phenytoin (Dilantin), both of which pose less risk of teratogenicity with comparable or better efficacy.

191.   The Depakote manufactured, designed, marketed, distributed, and sold by Defendants was not unavoidably unsafe, as alternative formulations for anti-seizure medications were available with comparable or better efficacy that did not pose the same teratogenic risk.

192.   Moreover, the Depakote manufactured, designed, marketed, distributed, and sold by Defendants was not unavoidably unsafe, because no use of any anti-seizure medication during pregnancy is safer than use of Depakote, and thus the teratogenic risks of Depakote could be avoided entirely during pregnancy.

193.   Based upon the foregoing, the Depakote manufactured, designed, marketed, distributed and sold by Defendants was defective in design at the time it left the Defendants' control.

194.   As a direct and proximate result of the defective design of Depakote

consumed by Plaintiff Tina Jameson and/or the Defendants' failure to comply with applicable federal requirements, Plaintiff D.J. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic, cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

195.   In addition, as a direct and proximate result of the defective design of Depakote consumed by Plaintiff Tina Jameson and /or the Defendants' failure to comply with applicable federal requirements, Plaintiffs Tina and William Jameson have suffered individual damages, including but not limited to economic harm and loss of consortium due to the injuries caused to Plaintiff D.J. and will continue to suffer said damages, harm and loss of consortium in the future.

196.   Defendants' acts were motivated by financial gain while the adverse consequences of the conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

## TENTH CAUSE OF ACTION

### Strict Products Liability
### Defect Due To Inadequate Warning
### (Jamesons and D.J.)

197.   Plaintiffs hereby incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

198.   Defendants are the manufacturers, designers, marketers, distributors, and sellers of Depakote.

199.   It was reasonably foreseeable that women of childbearing years, such as Plaintiff Tina Jameson, would become pregnant while on Depakote, and that a very high percentage of children exposed to Depakote in utero would suffer devastating teratogenic effects as a result.

200.   The Depakote manufactured, designed, marketed, distributed and sold by Defendants was defective due to inadequate warning or instruction because at the time it left the control of Defendants and was supplied to Plaintiff Tina Jameson, Defendants knew or should have known that their product was unreasonably dangerous, as confirmed by the extensive body of published literature and its own internal data, because Depakote substantially and significantly increases the risk of teratogenic effects compared to other treatment options for seizure control.

201.   Despite the fact that Defendants knew or should have known about the increased risk of teratogenicity with Depakote as compared to other treatment options for seizure control, Defendants failed to exercise reasonable care to adequately warn of the increased teratogenicity risk. In fact, Defendants denied in the Depakote product label at the time of Plaintiff Tina Jameson's product use that the association between Depakote and birth defects was causal.

202.   The Depakote manufactured and supplied by Defendants was defective due to inadequate warning or instruction because at the time it left the control of Defendants and was supplied to Plaintiff Tina Jameson, Defendants knew or should have known that their product was unreasonably dangerous, as confirmed by the extensive body of published literature and its own internal data, because higher doses of Depakote, such as that ingested daily by Plaintiff, substantially and significantly

increases the risk of teratogenic effects compared to lower doses.

203.   Despite the fact that Defendants knew or should have known about the increased risk of teratogenicity with higher doses of Depakote as compared to lower doses (such as doses under 1000 mg/day), Defendants failed to exercise reasonable care to adequately warn of the increased teratogenicity risk with higher doses of Depakote.  In fact, Defendants made no reference in the Depakote product label to the dose-response relationship between Depakote and severe congenital anomalies.

204.   The Depakote manufactured and supplied by Defendants was defective due to inadequate warning or instruction because at the time it left the control of Defendants and was supplied to Plaintiff Tina Jameson, Defendants knew or should have known that their product was unreasonably dangerous, as confirmed by the extensive body of medical literature and Defendants' internal data, because ingestion of Depakote substantially and significantly increases the risk of impaired cognitive function, neurodevelopmental delay, autism and autistic spectrum disorders.

205.   Despite the fact that Defendants knew or should have known about the increased risk of impaired cognitive function, neurodevelopmental delay, autism and autistic spectrum disorders caused by in utero exposure to Depakote, Defendants failed to exercise reasonable care to adequately warn of this increased risk. In fact, Defendants made no reference to any such increased risk in the Depakote product label at the time of Plaintiff's product use.

206.   The Depakote manufactured and supplied by Defendants was defective due to inadequate warning or instruction because at the time it left the control of Defendants and was supplied to Plaintiff Tina Jameson, Defendants knew or should

have known that their product was unreasonably dangerous for any use by women of childbearing years, as confirmed by the extensive body of medical literature and Defendants' internal data, because ingestion of Depakote substantially and significantly increases the risk of severe teratogenic effects to the developing fetus, the harm occurs in the very earliest weeks of pregnancy (often before the existence of the pregnancy is known), more than half of all pregnancies in the United States are unplanned, and Depakote cannot be readily discontinued without causing adverse withdrawal effects.

207.   Despite the fact that Defendants knew or should have known that Depakote should be completely contraindicated for women of childbearing years, Defendants failed to exercise reasonable care to adequately warn of the necessity of prohibiting women of childbearing years from ingesting this drug. Instead, Defendants denied that a cause-and-effect relationship had been proven between Depakote and birth defects, described the potential for teratogenicity as a class-wide effect, and advised that the benefits and the risks of using Depakote should be weighed (based upon the inaccurate and incomplete information contained in the product label), without revealing that other drugs in the class offered safer alternatives for seizure control in women of childbearing years.

208.   The Depakote manufactured and supplied by Defendants was also defective due to inadequate warning or instruction because at the time it left the control of Defendants and was supplied to Plaintiff Tina Jameson, Defendants knew or should have known that their product was unreasonably dangerous for any use by women of childbearing years, as confirmed by the extensive body of medical literature and Defendants' internal data, when compared to no treatment for seizure disorder during

pregnancy. Yet Defendants specifically claimed in the product label that no cause-and-effect relationship had been established between the use of Depakote and birth defects, and further claimed: "the epileptic condition itself may be more important than drug [i.e. Depakote] therapy in contributing to congenital abnormalities."

209.   Despite the fact that Defendants knew or should have known that using Depakote during pregnancy created a substantially greater risk to the fetus than no treatment for seizure disorder, Defendants failed to exercise reasonable care to adequately warn women and their doctors of the unreasonable risk posed by use of Depakote during pregnancy.

210.   The Depakote manufactured and supplied by Defendants was also defective due to inadequate warning or instruction because at the time it left the control of Defendants and was supplied to Plaintiff Tina Jameson, Defendants knew or should have known that their product was unreasonably dangerous and should be completely contraindicated during pregnancy, or should be a drug of last resort to be used during pregnancy only if all other available medications had been found to be ineffective in controlling seizures.

211.   The Depakote manufactured and supplied by Defendants was also defective due to inadequate post-marketing warning or instruction, because after Defendants knew or should have known of the substantially increased risks as described above, Defendants failed to provide adequate post-market or post-approval warnings to consumers and/or their health care providers, which they have authority to do as the holder of the NDAs, and failed to revise the Depakote label to warn of the serious and substantially increased risk of fetal death and major congenital

malformations caused by Depakote as compared to no use of anti-seizure medications, or compared to other anti-seizure medications when taken as prescribed, when taken in higher dosages, or when combined in polytherapy; nor did Defendants warn Plaintiff Tina Jameson or her physicians of the increased risk of cognitive impairment, neurodevelopmental delay, autism and autistic spectrum disorders, that alternative safer options were available, and that Depakote should not be ingested by women of childbearing years or only when all other treatment options had failed.

212.   The significantly increased risk of harm from the teratogenic properties of Depakote is not an open and obvious danger or a matter of common knowledge.

213.   As a direct and proximate result of the use of Depakote as manufactured, designed, marketed, distributed, and sold by Defendants and/or their failure to comply with applicable federal requirements, Plaintiff D.J. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic, cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

214.   In addition, as a direct and proximate result of the use of defective Depakote and/or the Defendants' failure to comply with applicable federal requirements, Plaintiffs Tina and William Jameson have suffered individual damages, including but not limited to economic harm and loss of consortium due to the injuries caused to D.J. and will continue to suffer said damages, harm, and loss of consortium in the future.

215.   Defendants' acts were motivated by financial gain while the adverse consequences of the conduct was actually known by Defendants. Defendants' conduct

was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

## ELEVENTH CAUSE OF ACTION

### Negligence
### (Jamesons and D.J.)

216.   Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

217.   Defendants had a duty to exercise reasonable care in the manufacture, design, distribution, marketing, labeling and sale of Depakote, including a duty to ensure that Depakote did not pose a significantly increased risk of bodily harm and adverse events.

218.   Defendants failed to exercise ordinary care in the design, formulation, manufacture, design, distribution, marketing, labeling and sale of Depakote in that Defendants knew, or should have known, that their products caused such significant bodily harm or death and was not safe for use by consumers.

219.   Defendants also failed to exercise ordinary care in the labeling of Depakote, and failed to issue to consumers and/or their health care providers adequate warnings of the increased risk of serious bodily injury or death due to the use of Depakote as compared to other alternative treatments.

220.   Despite the fact that Defendants knew or should have known that Depakote posed a serious and increased risk of bodily harm to consumers, Defendants continued to manufacture and market Depakote for use by consumers, including women of childbearing years such as Plaintiff Tina Jameson, and continued to knowingly

withhold critical safety information, such as the increased risk at higher doses, the increased risk compared to other treatment options, the increased risk compared to no treatment for seizures, and the increased risk of cognitive and neuropsychological disorders.  Further Defendants failed to warn that Depakote should either be completely contraindicated during pregnancy or used only when all other treatment options had proven ineffective in controlling seizures.

221.   Defendants knew or should have known that consumers, such as Plaintiff Tina Jameson, would foreseeably ingest Depakote during pregnancy and that their children would suffer injury as a result of Defendants' failure to exercise reasonable care as described above.

222.   As a direct and proximate result of Defendants' negligence and/or the failure to comply with applicable federal requirements, Plaintiffs Tina Jameson and D.J. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic, cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

223.   In addition, as a direct and proximate result of Defendants' negligence and/or the failure to comply with applicable federal requirements, Plaintiffs Tina and William Jameson have suffered individual damages, including but not limited to economic harm and loss of consortium due to the injuries caused to D.J. and will continue to suffer said damages, harm and loss of consortium in the future.

224.    Defendants' acts were motivated by financial gain while the adverse consequences of the conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

## TWELVTH CAUSE OF ACTION

### Negligent Misrepresentation and Fraud
### (Jamesons and D.J.)

225.    Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

226.    Defendants manufacture, design, market, label, distribute, and sell Depakote.

227.    Defendants have a duty not to deceive consumers and their physicians, including Plaintiff Tina Jameson, about Depakote.

228.    Defendants made representations to Plaintiff Tina Jameson and her physicians regarding the character and/or quality of Depakote for guidance in their decision to select Depakote for Plaintiff's use.

229.    Specifically, Defendants represented that their products were just as safe or even safer than other prescription drugs for treatment of seizure disorder available on the market.

230.    Defendants knew or should have known that such statements were false.

231.    Defendants stated that any risk of teratogenicity with Depakote was a class-wide risk common to anti-seizure medications in general.

232.   Defendants knew or should have known that this statement was false, and that Depakote posed a dramatically increased risk of teratogenicity compared to other anti-seizure drugs.

233.   Further, Defendants denied that the relationship between Depakote and birth defects was causal, and instead claimed that the association between Depakote and birth defects in the medical literature arose from intrinsic methodological problems, and that genetic risks and the risks posed by epilepsy itself were of greater teratogenicity concern than Depakote.

234.   Defendants knew or should have known that these statements were false, and that the relationship between Depakote and birth defects was causal, and that genetic factors and epilepsy itself did not create a greater risk of teratogenicity than Depakote.

235.   Defendants had actual or constructive knowledge based upon studies, published reports, and clinical experience of the dangerous teratogenic effects of Depakote, and of the fact that these risks were substantially greater than risks associated with other anti-seizure treatments or no treatment at all.

236.   Defendants negligently and/or intentionally misrepresented this information in Depakote's labeling, promotions and advertisements, in order to avoid losses and maximize profits in their sales to consumers and instead labeled, promoted, and advertised their product as being just as safe and effective as other anti-seizure medications.

237.   In supplying this false information, Defendants failed to exercise reasonable care or competence in obtaining safety information concerning Depakote

and in communicating this information to their intended recipients, including Plaintiff Tina Jameson and her physicians.

238.   Defendants had a duty to disclose to Plaintiff Tina Jameson and her physicians, as well as to the public, that Depakote was not safe for use by women of childbearing years due to its teratogenic effects, or should only be used when all other treatment options had proven ineffective.

239.   Defendants also had a duty to disclose the dose-response relationship between Depakote and birth defects and the increased risk of cognitive deficits, neurodevelopmental delay, behavioral disorders, autism and autistic spectrum disorder caused by use of Depakote.

240.   Defendants did not disclose any of the above information to Plaintiffs.

241.   Plaintiff Tina Jameson and her physicians reasonably relied to Plaintiffs' detriment upon Defendants' misrepresentations and/or omissions concerning the serious risks posed by Depakote in the product's labeling, advertisements and promotions. Plaintiff and her physicians reasonably relied to her detriment upon Defendants' representations that Depakote was just as safe and effective as other methods of treating and preventing seizures, or just as safe as no treatment of seizures during pregnancy.

242.   Defendants' representations that Defendants' labeling, advertisements and promotions fully and accurately described all known risks of the product were false.

243.   Had Plaintiff Tina Jameson or her physicians known of Defendants' concealment of the true facts—that Depakote was more dangerous for use by women of

childbearing years than other anti-seizure medications or no use of antiseizure medications—Plaintiff would not have been prescribed or used Depakote.

244.   As a direct and proximate result of Defendants' negligent or intentional misrepresentations and/or the failure to comply with applicable federal requirements, Plaintiff D.J. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic, cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

245.   In addition, as a direct and proximate result of Defendants' negligent or intentional misrepresentation and/or the failure to comply with applicable federal requirements, Plaintiffs Tina and William Jameson have suffered individual damages, including but not limited to economic harm and loss of consortium due to the injuries caused to D.J., and will continue to suffer said damages, harm and loss of consortium in the future.

246.   Defendants' acts were motivated by financial gain while the adverse consequences of the conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

## THIRTEENTH CAUSE OF ACTION

### Breach of Express Warranty
### (Jamesons and D.J.)

247.   Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

248.   Defendants expressly warranted that the relationship between Depakote and birth defects "cannot be regarded as a cause-and-effect relationship."

249.   The Depakote manufactured and sold by Defendants did not conform to this express representation because Depakote clearly is a human teratogen when taken in the recommended dosages.

250.   As a direct and proximate result of Defendants' breach of express warranty and/or the failure to comply with applicable federal requirements, Plaintiff D.J. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic, cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

251.   In addition, as a direct and proximate result of Defendants' breach of express warranty and/or the failure to comply with applicable federal requirements, Plaintiffs Tina and William Jameson have suffered individual damages, including but not limited to economic harm and loss of consortium due to the injuries caused to D.J. and will continue to suffer said damages, harm, and loss of consortium in the future.

252.   Defendants' acts were motivated by financial gain while the adverse consequences of the conduct was actually known by Defendants. Defendants' conduct

was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

## FOURTEENTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability
### (Treatment of Seizure Disorder During Pregnancy)
### (Jamesons and D.J.)

253.   Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

254.   At the time Defendants manufactured, marketed, sold, distributed, and/or supplied Depakote, Defendants impliedly warranted that the Depakote was just as safe for the treatment of seizure disorder during pregnancy as any other drugs in the anti-seizure class.

255.   At the time Defendants manufactured, marketed, sold, distributed, and/or supplied Depakote, Defendants knew or should have known that treatment of seizure disorders during pregnancy was within the ordinary purpose for which Depakote was to be used.

256.   Defendants impliedly warranted Depakote to be merchantable and safe for such use during pregnancy by claiming that the teratogenicity risks of Depakote were presumed to be the same as with other anti-seizure medications, when in fact the risks with Depakote were substantially greater.

257.   Contrary to these implied warranties of merchantability, Depakote was not of merchantable quality or safe for its intended use during pregnancy, because Depakote is unreasonably dangerous as described herein.

258.   As a direct and proximate result of Defendants' breach of implied warranty of merchantability and failure to comply with applicable federal requirements, D.J. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic, cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

259.   In addition, as a direct and proximate result of Defendants' breach of implied warranty of merchantability and failure to comply with applicable federal requirements, Plaintiffs Tina and William Jameson have suffered individual damages, including but not limited to economic harm and loss of consortium due to the injuries caused to D.J. and will continue to suffer said damages, harm, and loss of consortium in the future.

260.   Defendants' acts were motivated by financial gain while the adverse consequences of the conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

## FIFTEENTH CAUSE OF ACTION

### Breach of Implied Warranty of Fitness
### (Jamesons and D.J.)

261.   Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

262.   At the time Defendants manufactured, designed, marketed, sold, and/or distributed Depakote, Defendants had actual or constructive knowledge that consumers would choose Defendants' product, not only for its ordinary purpose (the treatment of seizure disorder), but also for the particular purpose of treating seizure disorder during pregnancy.

263.   Defendants impliedly warranted Depakote to be just as fit and safe for this particular purpose as any other anti-seizure medication.

264.   Contrary to this implied warranty of fitness, Depakote was not fit or safe for Plaintiff's particular use, because Depakote was unreasonably dangerous compared to other available anti-seizure medications as previously described.

265.   As a direct and proximate result Defendants' breach of implied warranty of fitness and/or failure to comply with applicable federal requirements, Plaintiff D.J. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic, cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

266.   In addition, as a direct and proximate result of Defendants' breach of implied warranty of fitness and/or failure to comply with applicable federal requirements, Plaintiffs Tina and William Jameson have suffered individual damages, including but not limited to economic harm and loss of consortium due to the injuries caused to D.J., and will continue to suffer said damages, harm, and loss of consortium in the future.

267.   Defendants' acts were motivated by financial gain while the adverse consequences of the conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

## SIXTEENTH CAUSE OF ACTION

**Loss of Consortium
Medical and Related Expenses
(Jamesons and D.J.)**

268.   Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

269.   As a direct and proximate result of the defective condition of Defendants' product, Depakote, Defendants' wrongful conduct, negligence, breach of warranties, negligent misrepresentation and fraud, and/or failure to comply with applicable federal requirements, as fully described above, Plaintiffs Tina and William Jameson, as the parents and natural guardians of D.J., have incurred significant economic harm, including but not limited to medical and medication expenses, caregiving expenses, and lost earnings, due to the injuries suffered by D.J. from in utero exposure to Depakote, and will continue to suffer such damages in the future.

270.   As a direct and proximate result of the actions by Defendants as described above and the defective condition of Defendants' product, Depakote, Defendants' wrongful conduct, negligence, breach of warranties, negligent misrepresentation and fraud, and/or the Defendants' failure to comply with applicable federal requirements, as fully described above, Plaintiffs Tina and William Jameson, as the parents and natural

guardians of D.J., have incurred a loss of parental consortium, including but not limited to the loss of the services, love, companionship, society, comfort, and solace of D.J., and the injury to or destruction of the parent-child relationship, due to the injuries suffered by D.J. from in utero exposure to Depakote, and will continue to suffer such losses in the future.

271.   Defendants' acts were motivated by financial gain while the adverse consequences of their conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

## SEVENTEENTH CAUSE OF ACTION

**Strict Products Liability**
**Design Defect**
**(Jamesons and T.J.)**

272.   Plaintiffs hereby incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

273.   Defendants are the manufacturers, designers, marketers, distributors and sellers of Depakote.

274.   The Depakote manufactured, designed, marketed, distributed and sold by Defendants was expected to and did reach consumers, including Plaintiff Tina Jameson, without any alterations or changes.

275.   The Depakote manufactured, designed, marketed, distributed and sold by Defendants was defective in design or formulation, because when it left the hands of the Defendants, the foreseeable risks of the product exceeded the benefits associated with its design or formulation.

58

276.   The Depakote manufactured, designed, marketed, distributed and sold by Defendants was defective in design or formulation, because when it left the hands of the Defendants, it was more dangerous than an ordinary consumer would expect.

277.   The foreseeable risks of Depakote include an increase in the occurrence of major congenital malformations from fetal exposure to Depakote, the magnitude of which is dramatic in terms of the number of women exposed, the incidence rate, and the devastating nature of resulting harm to the fetus.

278.   The fact that harm such as that suffered by Plaintiff T.J. will occur from use of Depakote by women of childbearing age is completely foreseeable because (1) Depakote is a known teratogen; (2) Defendants have not prohibited Depakote's use in women of childbearing years; (3) Defendants did not warn against use during pregnancy or limit its use to a drug of last resort; and (4) half of all pregnancies in the United States are unplanned, and few contraception measures are 100% effective.

279.   The likelihood that fetal death and injury would result from maternal use of Depakote is very high, based upon relative risk estimates of 6 or more, and studies confirming an incidence rate for major malformations of greater than 30% for infants born of women ingesting higher dosages of valproate.

280.   Depakote as manufactured, designed, marketed, distributed, and sold by Defendants is much more dangerous than an ordinary consumer would expect, as maternal use of Depakote during fetal development creates a very high risk of fetal death or major congenital malformations, as well as cognitive, developmental, neurological and behavioral dysfunction.

281.   At the time Defendants manufactured, designed, marketed, distributed, and sold Depakote to Plaintiff Tina Jameson, safer, more practical, alternative treatment options were available to treat her seizure disorder, including but not limited to prescription drug alternatives such as ethotoin (Peganone) and phenytoin (Dilantin), both of which pose less risk of teratogenicity with comparable or better efficacy.

282.   The Depakote manufactured, designed, marketed, distributed, and sold by Defendants was not unavoidably unsafe, as alternative formulations for anti-seizure medications were available with comparable or better efficacy that did not pose the same teratogenic risk.

283.   Moreover, the Depakote manufactured, designed, marketed, distributed, and sold by Defendants was not unavoidably unsafe, because no use of any anti-seizure medication during pregnancy is safer than use of Depakote, and thus the teratogenic risks of Depakote could be avoided entirely during pregnancy.

284.   Based upon the foregoing, the Depakote manufactured, designed, marketed, distributed and sold by Defendants was defective in design at the time it left the Defendants' control.

285.   As a direct and proximate result of the defective design of Depakote consumed by Plaintiff Tina Jameson and/or the Defendants' failure to comply with applicable federal requirements, Plaintiff T.J. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic, cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

286.   In addition, as a direct and proximate result of the defective design of Depakote consumed by Plaintiff Tina Jameson and /or the Defendants' failure to comply with applicable federal requirements, Plaintiffs Tina and William Jameson have suffered individual damages, including but not limited to economic harm and loss of consortium due to the injuries caused to Plaintiff T.J. and will continue to suffer said damages, harm and loss of consortium in the future.

287.   Defendants' acts were motivated by financial gain while the adverse consequences of the conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

## EIGHTEENTH CAUSE OF ACTION

### Strict Products Liability
### Defect Due To Inadequate Warning
### (Jamesons and T.J.)

288.   Plaintiffs hereby incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

289.   Defendants are the manufacturers, designers, marketers, distributors, and sellers of Depakote.

290.   It was reasonably foreseeable that women of childbearing years, such as Plaintiff Tina Jameson, would become pregnant while on Depakote, and that a very high percentage of children exposed to Depakote in utero would suffer devastating teratogenic effects as a result.

291.   The Depakote manufactured, designed, marketed, distributed and sold by Defendants was defective due to inadequate warning or instruction because at the time

it left the control of Defendants and was supplied to Plaintiff Tina Jameson, Defendants knew or should have known that their product was unreasonably dangerous, as confirmed by the extensive body of published literature and its own internal data, because Depakote substantially and significantly increases the risk of teratogenic effects compared to other treatment options for seizure control.

292.   Despite the fact that Defendants knew or should have known about the increased risk of teratogenicity with Depakote as compared to other treatment options for seizure control, Defendants failed to exercise reasonable care to adequately warn of the increased teratogenicity risk. In fact, Defendants denied in the Depakote product label at the time of Plaintiff Tina Jameson's product use that the association between Depakote and birth defects was causal.

293.   The Depakote manufactured and supplied by Defendants was defective due to inadequate warning or instruction because at the time it left the control of Defendants and was supplied to Plaintiff Tina Jameson, Defendants knew or should have known that their product was unreasonably dangerous, as confirmed by the extensive body of published literature and its own internal data, because higher doses of Depakote, such as that ingested daily by Plaintiff, substantially and significantly increases the risk of teratogenic effects compared to lower doses.

294.   Despite the fact that Defendants knew or should have known about the increased risk of teratogenicity with higher doses of Depakote as compared to lower doses (such as doses under 1000 mg/day), Defendants failed to exercise reasonable care to adequately warn of the increased teratogenicity risk with higher doses of Depakote. In fact, Defendants made no reference in the Depakote product label to the

dose-response relationship between Depakote and severe congenital anomalies.

295.   The Depakote manufactured and supplied by Defendants was defective due to inadequate warning or instruction because at the time it left the control of Defendants and was supplied to Plaintiff Tina Jameson, Defendants knew or should have known that their product was unreasonably dangerous, as confirmed by the extensive body of medical literature and Defendants' internal data, because ingestion of Depakote substantially and significantly increases the risk of impaired cognitive function, neurodevelopmental delay, autism and autistic spectrum disorders.

296.   Despite the fact that Defendants knew or should have known about the increased risk of impaired cognitive function, neurodevelopmental delay, autism and autistic spectrum disorders caused by in utero exposure to Depakote, Defendants failed to exercise reasonable care to adequately warn of this increased risk. In fact, Defendants made no reference to any such increased risk in the Depakote product label at the time of Plaintiff's product use.

297.   The Depakote manufactured and supplied by Defendants was defective due to inadequate warning or instruction because at the time it left the control of Defendants and was supplied to Plaintiff Tina Jameson, Defendants knew or should have known that their product was unreasonably dangerous for any use by women of childbearing years, as confirmed by the extensive body of medical literature and Defendants' internal data, because ingestion of Depakote substantially and significantly increases the risk of severe teratogenic effects to the developing fetus, the harm occurs in the very earliest weeks of pregnancy (often before the existence of the pregnancy is known), more than half of all pregnancies in the United States are unplanned, and

Depakote cannot be readily discontinued without causing adverse withdrawal effects.

298.   Despite the fact that Defendants knew or should have known that Depakote should be completely contraindicated for women of childbearing years, Defendants failed to exercise reasonable care to adequately warn of the necessity of prohibiting women of childbearing years from ingesting this drug. Instead, Defendants denied that a cause-and-effect relationship had been proven between Depakote and birth defects, described the potential for teratogenicity as a class-wide effect, and advised that the benefits and the risks of using Depakote should be weighed (based upon the inaccurate and incomplete information contained in the product label), without revealing that other drugs in the class offered safer alternatives for seizure control in women of childbearing years.

299.   The Depakote manufactured and supplied by Defendants was also defective due to inadequate warning or instruction because at the time it left the control of Defendants and was supplied to Plaintiff Tina Jameson, Defendants knew or should have known that their product was unreasonably dangerous for any use by women of childbearing years, as confirmed by the extensive body of medical literature and Defendants' internal data, when compared to no treatment for seizure disorder during pregnancy. Yet Defendants specifically claimed in the product label that no cause-and-effect relationship had been established between the use of Depakote and birth defects, and further claimed: "the epileptic condition itself may be more important than drug [i.e. Depakote] therapy in contributing to congenital abnormalities."

300.   Despite the fact that Defendants knew or should have known that using Depakote during pregnancy created a substantially greater risk to the fetus than no

treatment for seizure disorder, Defendants failed to exercise reasonable care to adequately warn women and their doctors of the unreasonable risk posed by use of Depakote during pregnancy.

301. The Depakote manufactured and supplied by Defendants was also defective due to inadequate warning or instruction because at the time it left the control of Defendants and was supplied to Plaintiff Tina Jameson, Defendants knew or should have known that their product was unreasonably dangerous and should be completely contraindicated during pregnancy, or should be a drug of last resort to be used during pregnancy only if all other available medications had been found to be ineffective in controlling seizures.

302. The Depakote manufactured and supplied by Defendants was also defective due to inadequate post-marketing warning or instruction, because after Defendants knew or should have known of the substantially increased risks as described above, Defendants failed to provide adequate post-market or post-approval warnings to consumers and/or their health care providers, which they have authority to do as the holder of the NDAs, and failed to revise the Depakote label to warn of the serious and substantially increased risk of fetal death and major congenital malformations caused by Depakote as compared to no use of anti-seizure medications, or compared to other anti-seizure medications when taken as prescribed, when taken in higher dosages, or when combined in polytherapy; nor did Defendants warn Plaintiff Tina Jameson or her physicians of the increased risk of cognitive impairment, neurodevelopmental delay, autism and autistic spectrum disorders, that alternative safer

options were available, and that Depakote should not be ingested by women of childbearing years or only when all other treatment options had failed.

303.   The significantly increased risk of harm from the teratogenic properties of Depakote is not an open and obvious danger or a matter of common knowledge.

304.   As a direct and proximate result of the use of Depakote as manufactured, designed, marketed, distributed, and sold by Defendants and/or their failure to comply with applicable federal requirements, Plaintiff T.J. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic, cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

305.   In addition, as a direct and proximate result of the use of defective Depakote and/or the Defendants' failure to comply with applicable federal requirements, Plaintiffs Tina and William Jameson have suffered individual damages, including but not limited to economic harm and loss of consortium due to the injuries caused to T.J. and will continue to suffer said damages, harm, and loss of consortium in the future.

306.   Defendants' acts were motivated by financial gain while the adverse consequences of the conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

## NINTEENTH CAUSE OF ACTION

### Negligence
### (Jamesons and T.J.)

307.   Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

308.   Defendants had a duty to exercise reasonable care in the manufacture, design, distribution, marketing, labeling and sale of Depakote, including a duty to ensure that Depakote did not pose a significantly increased risk of bodily harm and adverse events.

309.   Defendants failed to exercise ordinary care in the design, formulation, manufacture, design, distribution, marketing, labeling and sale of Depakote in that Defendants knew, or should have known, that their products caused such significant bodily harm or death and was not safe for use by consumers.

310.   Defendants also failed to exercise ordinary care in the labeling of Depakote, and failed to issue to consumers and/or their health care providers adequate warnings of the increased risk of serious bodily injury or death due to the use of Depakote as compared to other alternative treatments.

311.   Despite the fact that Defendants knew or should have known that Depakote posed a serious and increased risk of bodily harm to consumers, Defendants continued to manufacture and market Depakote for use by consumers, including women of childbearing years such as Plaintiff Tina Jameson, and continued to knowingly withhold critical safety information, such as the increased risk at higher doses, the increased risk compared to other treatment options, the increased risk compared to no treatment for seizures, and the increased risk of cognitive and neuropsychological

disorders.  Further Defendants failed to warn that Depakote should either be completely contraindicated during pregnancy or used only when all other treatment options had proven ineffective in controlling seizures.

312.   Defendants knew or should have known that consumers, such as Plaintiff Tina Jameson, would foreseeably ingest Depakote during pregnancy and that their children would suffer injury as a result of Defendants' failure to exercise reasonable care as described above.

313.   As a direct and proximate result of Defendants' negligence and/or the failure to comply with applicable federal requirements, Plaintiffs Tina Jameson and T.J. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic, cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

314.   In addition, as a direct and proximate result of Defendants' negligence and/or the failure to comply with applicable federal requirements, Plaintiffs Tina and William Jameson have suffered individual damages, including but not limited to economic harm and loss of consortium due to the injuries caused to T.J. and will continue to suffer said damages, harm and loss of consortium in the future.

315.   Defendants' acts were motivated by financial gain while the adverse consequences of the conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of

punitive damages.

## TWENTIETH CAUSE OF ACTION

### Negligent Misrepresentation and Fraud
### (Jamesons and T.J.)

316.   Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

317.   Defendants manufacture, design, market, label, distribute, and sell Depakote.

318.   Defendants have a duty not to deceive consumers and their physicians, including Plaintiff Tina Jameson, about Depakote.

319.   Defendants made representations to Plaintiff Tina Jameson and her physicians regarding the character and/or quality of Depakote for guidance in their decision to select Depakote for Plaintiff's use.

320.   Specifically, Defendants represented that their products were just as safe or even safer than other prescription drugs for treatment of seizure disorder available on the market.

321.   Defendants knew or should have known that such statements were false.

322.   Defendants stated that any risk of teratogenicity with Depakote was a class-wide risk common to anti-seizure medications in general.

323.   Defendants knew or should have known that this statement was false, and that Depakote posed a dramatically increased risk of teratogenicity compared to other anti-seizure drugs.

324.   Further, Defendants denied that the relationship between Depakote and birth defects was causal, and instead claimed that the association between Depakote

and birth defects in the medical literature arose from intrinsic methodological problems, and that genetic risks and the risks posed by epilepsy itself were of greater teratogenicity concern than Depakote.

325.   Defendants knew or should have known that these statements were false, and that the relationship between Depakote and birth defects was causal, and that genetic factors and epilepsy itself did not create a greater risk of teratogenicity than Depakote.

326.   Defendants had actual or constructive knowledge based upon studies, published reports, and clinical experience of the dangerous teratogenic effects of Depakote, and of the fact that these risks were substantially greater than risks associated with other anti-seizure treatments or no treatment at all.

327.   Defendants negligently and/or intentionally misrepresented this information in Depakote's labeling, promotions and advertisements, in order to avoid losses and maximize profits in their sales to consumers and instead labeled, promoted, and advertised their product as being just as safe and effective as other anti-seizure medications.

328.   In supplying this false information, Defendants failed to exercise reasonable care or competence in obtaining safety information concerning Depakote and in communicating this information to their intended recipients, including Plaintiff Tina Jameson and her physicians.

329.   Defendants had a duty to disclose to Plaintiff Tina Jameson and her physicians, as well as to the public, that Depakote was not safe for use by women of childbearing years due to its teratogenic effects, or should only be used when all other

treatment options had proven ineffective.

330.   Defendants also had a duty to disclose the dose-response relationship between Depakote and birth defects and the increased risk of cognitive deficits, neurodevelopmental delay, behavioral disorders, autism and autistic spectrum disorder caused by use of Depakote.

331.   Defendants did not disclose any of the above information to Plaintiffs.

332.   Plaintiff Tina Jameson and her physicians reasonably relied to Plaintiffs' detriment upon Defendants' misrepresentations and/or omissions concerning the serious risks posed by Depakote in the product's labeling, advertisements and promotions. Plaintiff and her physicians reasonably relied to her detriment upon Defendants' representations that Depakote was just as safe and effective as other methods of treating and preventing seizures, or just as safe as no treatment of seizures during pregnancy.

333.   Defendants' representations that Defendants' labeling, advertisements and promotions fully and accurately described all known risks of the product were false.

334.   Had Plaintiff Tina Jameson or her physicians known of Defendants' concealment of the true facts—that Depakote was more dangerous for use by women of childbearing years than other anti-seizure medications or no use of antiseizure medications—Plaintiff would not have been prescribed or used Depakote.

335.   As a direct and proximate result of Defendants' negligent or intentional misrepresentations and/or the failure to comply with applicable federal requirements, Plaintiff T.J. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic,

cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

336.   In addition, as a direct and proximate result of Defendants' negligent or intentional misrepresentation and/or the failure to comply with applicable federal requirements, Plaintiffs Tina and William Jameson have suffered individual damages, including but not limited to economic harm and loss of consortium due to the injuries caused to T.J., and will continue to suffer said damages, harm and loss of consortium in the future.

337.   Defendants' acts were motivated by financial gain while the adverse consequences of the conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

## TWENTY-FIRST CAUSE OF ACTION

### Breach of Express Warranty
### (Jamesons and T.J.)

338.   Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

339.   Defendants expressly warranted that the relationship between Depakote and birth defects "cannot be regarded as a cause-and-effect relationship."

340.   The Depakote manufactured and sold by Defendants did not conform to this express representation because Depakote clearly is a human teratogen when taken in the recommended dosages.

341.   As a direct and proximate result of Defendants' breach of express warranty and/or the failure to comply with applicable federal requirements, Plaintiff T.J. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic, cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

342.   In addition, as a direct and proximate result of Defendants' breach of express warranty and/or the failure to comply with applicable federal requirements, Plaintiffs Tina and William Jameson have suffered individual damages, including but not limited to economic harm and loss of consortium due to the injuries caused to T.J. and will continue to suffer said damages, harm, and loss of consortium in the future.

343.   Defendants' acts were motivated by financial gain while the adverse consequences of the conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

### TWENTY-SECOND CAUSE OF ACTION

**Breach of Implied Warranty of Merchantability**
**(Treatment of Seizure Disorder During Pregnancy)**
**(Jamesons and T.J.)**

344.   Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

345.   At the time Defendants manufactured, marketed, sold, distributed, and/or supplied Depakote, Defendants impliedly warranted that the Depakote was just as safe

for the treatment of seizure disorder during pregnancy as any other drugs in the anti-seizure class.

346.   At the time Defendants manufactured, marketed, sold, distributed, and/or supplied Depakote, Defendants knew or should have known that treatment of seizure disorders during pregnancy was within the ordinary purpose for which Depakote was to be used.

347.   Defendants impliedly warranted Depakote to be merchantable and safe for such use during pregnancy by claiming that the teratogenicity risks of Depakote were presumed to be the same as with other anti-seizure medications, when in fact the risks with Depakote were substantially greater.

348.   Contrary to these implied warranties of merchantability, Depakote was not of merchantable quality or safe for its intended use during pregnancy, because Depakote is unreasonably dangerous as described herein.

349.   As a direct and proximate result of Defendants' breach of implied warranty of merchantability and failure to comply with applicable federal requirements, T.J. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic, cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

350.   In addition, as a direct and proximate result of Defendants' breach of implied warranty of merchantability and failure to comply with applicable federal requirements, Plaintiffs Tina and William Jameson have suffered individual damages,

including but not limited to economic harm and loss of consortium due to the injuries caused to T.J. and will continue to suffer said damages, harm, and loss of consortium in the future.

351.   Defendants' acts were motivated by financial gain while the adverse consequences of the conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

## TWENTY-THIRD CAUSE OF ACTION

### Breach of Implied Warranty of Fitness
### (Jamesons and T.J.)

352.   Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

353.   At the time Defendants manufactured, designed, marketed, sold, and/or distributed Depakote, Defendants had actual or constructive knowledge that consumers would choose Defendants' product, not only for its ordinary purpose (the treatment of seizure disorder), but also for the particular purpose of treating seizure disorder during pregnancy.

354.   Defendants impliedly warranted Depakote to be just as fit and safe for this particular purpose as any other anti-seizure medication.

355.   Contrary to this implied warranty of fitness, Depakote was not fit or safe for Plaintiff's particular use, because Depakote was unreasonably dangerous compared to other available anti-seizure medications as previously described.

356.    As a direct and proximate result Defendants' breach of implied warranty of fitness and/or failure to comply with applicable federal requirements, Plaintiff T.J. suffered damages, including but not limited to personal injury, bodily harm, emotional distress, pain and suffering, permanent physical, mental, neurologic, cognitive and behavioral injuries, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

357.    In addition, as a direct and proximate result of Defendants' breach of implied warranty of fitness and/or failure to comply with applicable federal requirements, Plaintiffs Tina and William Jameson have suffered individual damages, including but not limited to economic harm and loss of consortium due to the injuries caused to T.J., and will continue to suffer said damages, harm, and loss of consortium in the future.

358.    Defendants' acts were motivated by financial gain while the adverse consequences of the conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

## TWENTY-FOURTH CAUSE OF ACTION

### Loss of Consortium
### Medical and Related Expenses
### (Jamesons and T.J.)

359.    Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

360.    As a direct and proximate result of the defective condition of Defendants'

product, Depakote, Defendants' wrongful conduct, negligence, breach of warranties, negligent misrepresentation and fraud, and/or failure to comply with applicable federal requirements, as fully described above, Plaintiffs Tina and William Jameson, as the parents and natural guardians of T.J., have incurred significant economic harm, including but not limited to medical and medication expenses, caregiving expenses, and lost earnings, due to the injuries suffered by T.J. from in utero exposure to Depakote, and will continue to suffer such damages in the future.

361.   As a direct and proximate result of the actions by Defendants as described above and the defective condition of Defendants' product, Depakote, Defendants' wrongful conduct, negligence, breach of warranties, negligent misrepresentation and fraud, and/or the Defendants' failure to comply with applicable federal requirements, as fully described above, Plaintiffs Tina and William Jameson, as the parents and natural guardians of T.J., have incurred a loss of parental consortium, including but not limited to the loss of the services, love, companionship, society, comfort, and solace of T.J., and the injury to or destruction of the parent-child relationship, due to the injuries suffered by T.J. from in utero exposure to Depakote, and will continue to suffer such losses in the future.

362.   Defendants' acts were motivated by financial gain while the adverse consequences of their conduct was actually known by Defendants. Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence, and evidenced reckless indifference to Plaintiffs' rights, so as to warrant the imposition of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against the Defendants on each of the above-referenced claims and Causes of Action and further demand as follows:

i.      Compensatory damages in excess of the minimum jurisdictional amount, including but not limited to compensation for injury, pain, suffering, mental anguish, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined by the trier of fact in this action;

ii.      Economic damages in the form of medical expenses, out-of-pocket expenses, child care expenses, life care expenses, lost earnings, and other economic damages in an amount to be determined by the trier of fact in this action;

iii.      Attorneys' fees, expenses, and costs of this action;

iv.      Punitive damages; and

v.      Such further relief as this Honorable Court deems necessary, just, and proper.

RESPECTFULLY SUBMITTED,


/s/ Melanie S. Bailey

Janet G. Abaray                     Melanie S. Bailey (86679)
**BURG SIMPSON ELDREDGE**           **BURG SIMPSON ELDREDGE**
**HERSH & JARDINE, P.C.**           **HERSH & JARDINE, P.C.**
312 Walnut Street, Suite 2090       312 Walnut Street, Suite 2090
Cincinnati, OH 45202                Cincinnati, OH 45202
Phone: (513) 852-5600               Phone: (513) 852-5600
Fax: (513) 852-5611                 Fax: (513) 852-5611
E-mail: jabaray@burgsimpson.com     E-mail: mbailey@burgsimpson.com

OF COUNSEL                          COUNSEL FOR PLAINTIFFS


## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury as to all issues so triable.

/s/ Melanie S. Bailey
Melanie S. Bailey